UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | | |
|---|---|---|
| **CHARLES RUSLAVAGE, AND MARIO SENECA** individually and for others similarly situated, | § § § § § | **DOCKET NO.** |
| Plaintiff, | § § | |
| | § | **JURY TRIAL DEMANDED** |
| v. | § § | **CLASS/COLLECTIVE ACTION** |
| **PENNSYLVANIA INTERSCHOLASTIC ATHLETIC ASSOCIATION, INC.** | § § § § § | **PURSUANT TO 29 U.S.C. § 216(b)/ FED. R. CIV. P. 23** |
| Defendant. | § § § | |

## CLASS AND COLLECTIVE ACTION COMPLAINT

### I.  SUMMARY

1. Charles Ruslavage and Mario Seneca ("Plaintiffs") bring this class and collective action lawsuit to recover damages resulting from unpaid working time stemming from minimum wage and overtime violations by Defendant Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA") under the Fair Labor Standards Act ("FLSA") and the Pennsylvania Minimum Wage Act ("PMWA").

2. PIAA misclassified Plaintiffs and all other sports officials as independent contractors, required them to work off the clock without any pay and overtime without pay equal to one and one-half times their regular rate of pay.

3. The National Labor Relations Board reviewed the independent contractor status of PIAA officials, and affirmed "the Regional Director's finding that the lacrosse officials are statutory employees. *See Pennsylvania Interscholatic Athletic Ass'n, Inc.and Office & Prof'l Employees Int'l Union*, 365 NLRB No. 107 (July 11, 2017), attached as Exhibit A; *see also* Exhibit B.

4. On information and belief, the PIAA has over 13,200 registered sports officials[1] which it misclassifies as independent contractors and fails to pay for meetings, training sessions, travel, pre and post game work, uniforms and uniform care, etc. These individuals make up the proposed class.

5. In certain weeks, the PIAA does not pay the Class Members anything at all, but requires attendance at PIAA events. This is a clear violation of the FLSA and PMWA's minimum wage requirements.

6. In other weeks, the PIAA requires the Class Members to perform work outside the sporting events for which the sports officials are paid. The amount of time spent performing these additional duties reduces the workers hourly rate to that which is below the minimum wage requirements of the FLSA and PMWA.

7. Finally, the PIAA does not pay overtime whatsoever to Class Members who work more than 40 hours in any week as required by the FLSA and PMWA.

8. Plaintiffs and their similarly situated co-workers seek to recover the unpaid minimum wages, overtime, attorney fees, and costs.

## II. JURISDICTION AND VENUE

9. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the FLSA. 29 U.S.C. § 216(b).

10. The Court has federal jurisdiction over this action pursuant to the jurisdictional provisions of the Class Action Fairness Act, 28 U.S.C. § 1332(d). The Court also has supplemental jurisdiction over any state law sub-class pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

---

[1] See https://www.piaa.org/about/philosophy.aspx

12. Plaintiffs worked for Defendant in this District and Division and Defendant conducts substantial business operations in this District and Division.

### III.   THE PARTIES

13. Ruslavage is an adult individual who is a resident of Canonsburg, Pennsylvania, which is located within Washington County.

14. Ruslavage worked for Defendant from approximately September 2004 until the present.

15. Ruslavage worked for Defendant as a sports official in the Western District of Pennsylvania, Pittsburgh Division.

16. Ruslavage's written consent to this action is on file with the Court as Exhibit C.

17. Throughout Ruslavage's employment with Defendant, Ruslavage was paid on a per game basis, with no pay for additional work duties or overtime.

18. Ruslavage was not paid at least minimum wage for all hours worked.

19. Ruslavage is an adult individual who is a resident of Cannonsberg, Pennsylvania, which is located within Washington County.

20. Seneca worked for Defendant from approximately March 2000 until the present.

21. Seneca worked for Defendant as a sports official in the Western District of Pennsylvania, Pittsburgh Division.

22. Seneca's written consent to this action is on file with the Court as Exhibit D.

23. Throughout Seneca's employment with Defendant, Seneca was paid on a per game basis, with no pay for additional work duties or overtime.

24. Seneca was not paid at least minimum wage for all hours worked.

25. Seneca is an adult individual who is a resident of Wexford, Pennsylvania, which is located within Allegheny County.

26. Plaintiffs bring this action on behalf of themselves and all other similarly situated sports officials who were classified as independent contractors and paid through Defendant's per-game system for minimum wage and overtime violations under the FLSA and PMWA.

27. The class of similarly situated employees or putative class members sought to be certified is defined as follows:

> **ALL CURRENT AND FORMER SPORTS OFFICIALS OF THE PENNSYLVANIA INTERSCHOLASTIC ATHLETIC ASSOCIATION, INC. WHO WERE CLASSIFIED AS INDEPENDENT CONTRACTORS AND PAID ON A PER GAME BASIS DURING THE LAST THREE (3) YEARS. (**"Class Members")

28. Plaintiffs also seek class certification of such a class under FED. R. CIV. P. 23 under the PMWA.

29. Defendant **the Pennsylvania Interscholastic Athletic Association, Inc.**, is a Pennsylvania organization doing business throughout Pennsylvania and can be served through its officers and directors, including **Robert Lombardi**, at: **212 North 3rd St., Harrisburg, PA**.

## IV.   COVERAGE UNDER THE FLSA

30. At all times hereinafter mentioned, Defendant has been an employer within the meaning of the Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

31. At all times hereinafter mentioned, Defendant has been part of an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

32. At all times hereinafter mentioned, Defendant has been part of an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprise has and has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials – such as tools, cell phones, and personal protective equipment - that have been moved in or produced for commerce by any person and in that Defendant has had and

4

have an annual gross volume of sales made or business done of not less than $1,000,000 (exclusive of excise taxes at the retail level which are separately stated).

33. At all times hereinafter mentioned, Plaintiffs and the Class Members were engaged in commerce or in the production of goods for commerce.

34. As will be shown through this litigation, Defendant treated Plaintiffs (and indeed all of its workers that it classified as independent contractors and paid a game rate to without minimum wage or overtime compensation) as employees and uniformly dictated the pay practices of Plaintiffs and its other workers including its so-called "independent contractors".

35. Defendant's misclassification of Plaintiffs as an independent contractor does not alter the status as employees for purposes of the FLSA or the PMWA.

## V.   FACTS

36. "PIAA was formed in Pittsburgh, on December 29, 1913, by a group of high school Principals who desired to eliminate abuses, establish uniform rules, and place interscholastic athletics in the overall context of secondary education." *See* http://www.piaa.org/about/philosophy.aspx

37. "PIAA was given the privilege of serving its member schools and registered officials by establishing policies and adopting Contest rules that:

- emphasize the educational values of interscholastic athletics,
- promote safe and sportsmanlike competition, and
- provide uniform standards for all interscholastic levels of competition.

As a result of the cooperative efforts of its membership, PIAA has assisted middle school, junior high school, intermediate school, and senior high school students in participating in interscholastic athletic programs…" *See* http://www.piaa.org/about/introduction.aspx

5

38. The "purpose and function of PIAA is to develop and enforce rules, which are authorized or adopted by the member schools, regulating interscholastic athletic competition." See http://www.piaa.org/about/philosophy.aspx .

39. The PIAA establishes and enforces "rules governing the eligibility of high school athletes to participate in interscholastic athletics. These include rules for transfer students, physical examinations, age, amateur status, attendance, parental consent, pre-participation (semesters and seasons), and academic performance." Id.

40. The PIAA covers most sports, including basketball, bowling, competitive spirit, gymnastics, indoor track and field, rifle, swimming and diving, wrestling, baseball, lacrosse, softball, tennis, track and field, volleyball, cross country, field hockey, football, golf, soccer, and water polo.

41. To perform the services and achieve the goals of uniform performance of athletics, the PIAA employs sports officials.

42. The sports officials – or Class Members – are trained, worked, and paid at the direction of PIAA.

43. In fact, every aspect of the Class Members' jobs are controlled and determined by PIAA, down to their uniforms worn and locations they stand of the field during sporting events. See generally Exhibit E.

44. Class members are required by PIAA to: (1) apply using PIAA's application mechanism including mandatory tests selected and administered by PIAA; (2) be accepted as an official by the Executive Director, who has the power to reject any application; (3) affiliate with a PIAA chapter within 15 days of acceptance as an official; (4) attend the PIAA Convention once every five years if an official wishes to be eligible for post-season officiating opportunities; (5) adhere to PIAA's specific uniform requirements; (6) accept PIAA's established scheme for payment during the regular season; (7) submit reports within twenty-four hours of disqualifying a coach or player; (8) cooperate with

PIAA's executive staff and/or district committees concerning officials' conduct; (9) accept the dictated game schedule determined within the confines set by PIAA; (10) accept unilaterally established fees for post-season game assignments; (11) be subject to suspension, probation, or removal for failing to comply with what the regional director characterizes as "PIAA's vast array of rules"; and (12) be subject to PIAA's authority to abolish PIAA chapters, an integral part of the officials' job structure.

45. Various PIAA publications give the PIAA the ability to suspend or remove Class Members for failing to adhere to PIAA rules and policies. *See* Exhibit F at Page 31-34; Exhibit G at Page 31-44.

46. The Class Members do not have an opportunity to meaningfully affect their profit or loss through their work for PIAA.

47. The Class Members are not performing their job functions as a separate business, but in furtherance of PIAA's operations and the officials are fully integrated into PIAA's operations.

48. The Class Members have no control over when contests are scheduled.

49. The Class Members have no ability to demand that games be held at particular times and locations.

50. The Class Members have no control over important business decisions of the PIAA.

51. The Class Members also are unable to re-assign or subcontract their assignments to other officials.

52. The Class Members perform work at the direction of the PIAA, by PIAA (1) requiring specific uniforms; (2) requiring Class Members to join chapters and attend at least 7 meetings per year; (3) resolving fee disputes during regular season contests; (4) determining who is eligible to become a PIAA official; (5) determining when Class Members should be suspended or removed form their performance; (6) setting the parameters within which regular season contests may be scheduled; and (7) scheduling post-season games.

53. The job the Class Members perform does not require any unique skill. In fact, the PIAA provides all the training needed to be a sports official for any sport. This is done through its through its rules interpretation trainings and meetings, sport-specific bulletins, and required chapter meetings.

54. PIAA provides the Class Members with a place of work through its agreements with PIAA member schools.

55. The class members have no say in where they perform their PIAA work and would not be able to perform their PIAA work at locations of their own choosing outside of the PIAA member-school network.

56. Class Members work for PIAA for years at a time.

57. PIAA sets the rates of pay each Class Member shall receive per game.

58. The Class Members work is integral to the operation of the PIAA.

59. PIAA could not perform is operations without the work of its officials – a pool of certified officials is one of the primary services PIAA provides to member schools.

60. Despite these facts, PIAA treats all Class Members as independent contractors, only pays them for games which they work, fails to pay for required trainings, meetings, pre and post game work, for uniforms and uniform cleaning, and any overtime worked.

61. For instance, there was a basketball rules international meeting on November 7, 2017 and a football chapter meeting on November 8, 2017.

62. Class Members attending these events, but not officiating any games during that week, received no compensation from the PIAA in that workweek.

63. They should have at least been paid minimum wage for the hours worked at these required events.

64. This is a clear violation of the FLSA and PMWA's minimum wage requirements.

65. In other weeks, the PIAA requires the class members to perform work outside the sporting events for which the sports officials are paid. Class Members were required to drive to, between, and from sporting events, meetings, training, conferences, and other work events; attend meetings, training sessions, and meetings; complete pre and post game reports, paperwork, and other assignment; and purchase and ready their required uniforms.

66. The amount of time spent performing these additional duties reduces the workers hourly rate to that below the minimum wage requirements of the FLSA and PMWA.

67. Finally, the PIAA does not pay overtime whatsoever to sports officials who work more than 40 hours in any week as required by the FLSA and PMWA.

### VI. FLSA VIOLATIONS

68. Defendant misclassified Plaintiffs and the Class Members as independent contractors.

69. As set forth herein, Defendant has violated, and is violating, Section 6 of the FLSA, 29 U.S.C. § 206, by employing employees in an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA and not paying for all hours worked at least minimum wage.

70. As set forth herein, Defendant has violated, and is violating, Section 7 of the FLSA, 29 U.S.C. § 207, by employing employees in an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA for workweeks longer than forty (40) hours without compensating such employees for their employment in excess of forty (40) hours per week at rates no less than 1 and ½ times the regular rates for which they were employed.

71. Defendant knowingly, willfully, or in reckless disregard carried out this illegal pattern or practice of failing to pay the Class Members overtime compensation. Defendant's failure to pay overtime compensation to these employees was neither reasonable, nor was the decision not to pay overtime made in good faith.

72. Accordingly, Plaintiffs and all those who are similarly situated are entitled to minimum wage and overtime wages under the FLSA, plus liquidated damages, attorney's fees and costs.

### VII. PMWA Violations

73. Plaintiffs bring this claim under the PMWA as a Rule 23 class action.

74. The conduct alleged violates the PMWA minimum wage and overtime requirements (43 Pa. Stat. Ann. § 333.104).

75. At all relevant times, Defendant was subject to the requirements of the PMWA.

76. At all relevant times, Defendant employed Plaintiffs and each Class Member with Pennsylvania state law claims as an "employee" within the meaning of the PMWA.

77. The PMWA requires employers like Defendant to pay employees at one and one-half (1.5) times the regular rate of pay for hours worked in excess of forty (40) hours in any one week.

78. The PMWA requires employers like Defendant to pay at least minimum wage for all hours worked in a single week.

79. Defendant has a policy and practice of misclassifying Plaintiffs and each Class Member as independent contractors and failing to pay these workers minimum wage and overtime for hours worked in excess of 40 hours per workweek.

### VIII. Class and Collective Action Allegations

80. Plaintiffs incorporate all previous paragraphs and alleges that the illegal pay practices Defendant imposed on Plaintiffs were likewise imposed on the Class Members.

81. Numerous individuals were victimized by this pattern, practice, and policy which is in willful violation of the FLSA and PMWA.

82. Numerous other individuals who worked with Plaintiffs indicated they were improperly classified as independent contractors, paid in the same manner, performed similar work, and were not properly compensated for all hours worked as required by state and federal wage laws.

83. Based on their experiences and tenure with Defendant, Plaintiffs are aware that Defendant's illegal practices were imposed on the Class Members.

84. The Class Members were all improperly classified as independent contractors and not afforded the minimum wage and overtime compensation when they worked in excess of forty (40) hours per week.

85. Defendant's failure to pay minimum wages and overtime compensation at the rates required by state and/or federal law result from generally applicable, systematic policies, and practices which are not dependent on the personal circumstances of the Class Members.

86. Plaintiffs' experiences are therefore typical of the experiences of the Class Members.

87. The specific job titles or precise job locations of the Class Members do not prevent class or collective treatment.

88. Plaintiffs have no interest contrary to, or in conflict with, the Class Members. Like each Class Member, Plaintiffs have an interest in obtaining the unpaid minimum wage and overtime wages owed to him under state and/or federal law.

89. A class and collective action, such as the instant one, is superior to other available means for fair and efficient adjudication of the lawsuit.

90. Absent this action, many Class Members likely will not obtain redress of their injuries and Defendant will reap the unjust benefits of violating the FLSA and PMWA.

91. Furthermore, even if some of the Class Members could afford individual litigation against Defendant, it would be unduly burdensome to the judicial system.

92. Concentrating the litigation in one forum will promote judicial economy and parity among the claims of individual members of the classes and provide for judicial consistency.

93. The questions of law and fact common to the Class Members predominate over any questions affecting solely the individual members. Among the common questions of law and fact are:

    a.    Whether Defendant employed the Class Members within the meaning of the applicable state and federal statutes, including the FLSA and PMWA;

    b.    Whether the Class Members were improperly misclassified as independent contractors;

    c.    Whether Defendant's decision to classify the Class Members as independent contractors was made in good faith;

    d.    Whether Defendant's decision to not pay wages to the Class Members for all hours worked was made in good faith;

    e.    Whether Defendant's decision to not pay time and a half for overtime to the Class Members was made in good faith;

    f.    Whether Defendant's violation of the FLSA was willful; and

    g.    Whether Defendant's illegal pay practices were applied uniformly across Pennsylvania to all Class Members.

94.    Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the Class Members sustained damages arising out of Defendant's illegal and uniform employment policy.

95.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a collective or class action.

96.    Although the issue of damages may be somewhat individual in character, there is no detraction from the common nucleus of liability facts. Therefore, this issue does not preclude collective and class action treatment.

### IX.    JURY DEMAND

97.    Plaintiffs demand a trial by jury.

### X.    RELIEF SOUGHT

98.    WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

a. An Order designating this lawsuit as a collective action and permitting the issuance of a notice pursuant to 29 U.S.C. § 216(b) to all similarly situated individuals with instructions to permit them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b);

b. For an Order pursuant to Section 16(b) of the FLSA finding Defendant liable for unpaid back wages due to Plaintiffs and the Class Members for liquidated damages equal in amount to their unpaid compensation;

c. For an Order designating the state law class as a class action pursuant to Fed. R. Civ. P. 23;

d. For an Order appointing Plaintiffs and their counsel as Class Counsel to represent the interests of the both the federal and state law classes;

e. For an Order finding Defendant liable for unpaid back wages to Plaintiffs and the Class Members under the PMWA;

f. For an Order awarding attorneys' fees, costs and pre- and post-judgment interest; and

g. For an Order granting such other and further relief as may be necessary and appropriate.

Respectfully submitted,

By: */s/ Andrew W. Dunlap*
**Michael A. Josephson**
Texas Bar No. 24014780
P.A. Bar No. 308410
**Andrew W. Dunlap**
Texas Bar No. 24078444
**JOSEPHSON DUNLAP LAW FIRM**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
713-352-1100 – Telephone
713-352-3300 – Facsimile
mjosephson@mybackwages.com
adunlap@mybackwages.com

**AND**

*/s/ Joshua P. Geist*
Joshua P. Geist
PA. I.D. No. 85745
**GOODRICH & GEIST, P.C.**
3634 California Ave.
Pittsburgh, PA 15212
Tel: (412) 766-1455
Fax: (412)766-0300
josh@goodrichandgeist.com

**AND**

Richard J. (Rex) Burch
Texas Bar No. 24001807
**BRUCKNER BURCH, P.L.L.C.**
8 Greenway Plaza, Suite 1500
Houston, Texas 77046
713-877-8788 – Telephone
713-877-8065 – Facsimile
rburch@brucknerburch.com

**ATTORNEYS IN CHARGE FOR PLAINTIFF**