EXHIBIT 1

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

The parties to this Settlement Agreement and Release ("Agreement") are Defendant, Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA" or "Defendant"), on the one hand, and, on the other hand, Plaintiffs Charles Ruslavage and Mario Seneca ("Named Plaintiffs") and the 444 individuals (the "Opt-In Plaintiffs") who have opted in to the lawsuit filed at *Charles Ruslavage and Mario Seneca, individually and for others similarly situated vs. Pennsylvania Interscholastic Athletic Association, Inc.*, Case No. 2:17-cv-01598 (W.D.Pa.) (collectively, Named Plaintiffs and Opt-In Plaintiffs are referred to as the "Class Members," and Class Members and PIAA are collectively referred to as the "Parties").

## RECITALS

WHEREAS, Named Plaintiffs filed the above-styled lawsuit against Defendant on December 8, 2017 (the "Lawsuit") asserting that Defendant had misclassified Named Plaintiffs and other PIAA-registered officials as independent contractors and failed to pay Named Plaintiffs and other PIAA-registered officials  minimum wage as required by the Fair Labor Standards Act ("FLSA") and Pennsylvania Minimum Wage Act ("PMWA").

WHEREAS, on June 22, 2018, the Court issued an Order approving a Stipulation to Conditional Certification and Notice to Putative Class Members (Doc. No. 40).

WHEREAS, following notice of the Lawsuit, each Opt-In Plaintiff signed and filed a "Consent To Join Collective Action" ("Consent") (Doc. Nos. 48, 49, 50, 51, 52, 53, 54, 56, 57, 58, 59, 60, 61, 63, 65, 66, 67, 70, 76).  The Consent filed by each Opt-In Plaintiff specifies that each Opt-In Plaintiff consents to "having the class representatives, Charles Ruslavage and Mario Seneca, and Plaintiffs' Counsel make all decisions regarding the litigation, including all decisions regarding settlement or trial, the terms of settlement and release of claims, and agreements regarding attorney fees and costs."

WHEREAS, the Parties engaged in significant discovery in order to evaluate the relative strength of the claims of the Class Members and Defendant's defenses.

WHEREAS, Defendant denies the allegations in the Lawsuit, denies that Class Members were misclassified as independent contractors, and denies that it engaged in any wrongdoing or that it violated the law in any respect.

WHEREAS, the Parties recognize that achieving a final result through the litigation process would require substantial additional risk, discovery, time, and expense.

WHEREAS, on March 6, 2019, the parties reached a Memorandum of Understanding (attached hereto as Exhibit 1) establishing a high/low framework for settlement, which framework was contingent upon the outcome of an appeal then-pending before the United States Court of Appeals for the District of Columbia Circuit in *PIAA vs. NLRB*, Nos. 18-1037 and 18-1043.

WHEREAS, on June 14, 2019, the United States Court of Appeals for the District of Columbia Circuit issued its decision (attached hereto as Exhibit 2) in *PIAA vs. NLRB*, Nos. 18-1037 and 18-1043, reversing the prior decision of the NLRB.

WHEREAS, the Parties desire to compromise and settle all issues and claims that have been brought in the Lawsuit or could have been brought in the Lawsuit by or on behalf of Named Plaintiffs and the Opt-In Plaintiffs, and the parties will use their best efforts, including all steps and efforts that may become necessary by Order of the Court to effectuate the terms and purposes of this Settlement Agreement.

## AGREEMENT

The Parties, intending to be legally bound and in consideration of the mutual promises and other good and valuable consideration set forth herein, do hereby agree, subject to approval of the Court, as follows:

1.    <u>Definitions</u>.

    A.    <u>Class Period</u>: The period from December 8, 2014 to the date of execution of this Agreement by Named Plaintiffs.

    B.    <u>Class Counsel</u>: Josephson Dunlap Law Firm; Goodrich & Geist, P.C.; and, Bruckner Burch PLLC.

    C.    <u>Settlement Administrator</u>: ILYM Group, Inc.

    D.    <u>Settlement Notice</u>:  The Settlement Notice is the document attached hereto as Exhibit 3.

2.    <u>Approval</u>.  This settlement is contingent upon approval of the Court.  Class Counsel shall prepare a Motion for Approval of this Settlement ("Approval Motion") and for dismissal of the Lawsuit, and any other documents that are needed to obtain approval of the Agreement and effectuate dismissal of the Lawsuit.

3.    <u>Settlement Fund</u>.  The total gross amount of the settlement fund will be $262,500 ("Gross Settlement Amount"). All payments to and on behalf of Class Members, including all attorneys' fees and costs, will be paid from this Settlement Fund. Except as provided below with respect to the PIAA Officials' Convention attendance, under no condition will PIAA's total liability under the terms of this Settlement Agreement exceed the applicable Gross Settlement Amount identified above.

4.    <u>PIAA Officials' Convention Attendance</u>.  PIAA agrees that each Class Member will be permitted to attend one PIAA Annual Officials' Convention between 2020 and 2024 without paying the registration fee, provided that the Class Member remains an active PIAA-registered Official at the time of the Convention. The approximate value of the PIAA Officials' Convention attendance for all Class Members is $45,000.00.

5.    <u>Settlement Fund Allocation</u>.  The following amounts shall be paid by the Settlement Administrator from the Gross Settlement Amount:

    A.  <u>Class Counsel Fees</u>

    Class Counsel shall receive attorneys' fees in an amount equal to 35% of the sum total of the Gross Settlement Amount plus $45,000 (the approximate value of the PIAA Officials' Convention attendance pursuant to Section 4, above) (Gross Settlement Amount + $45,000.00 x .35). This payment will compensate Class Counsel for all work performed in connection with the Lawsuit, including but not limited to, any work that remains to be performed documenting the Settlement, securing approval of the Settlement, making sure that the Settlement is fairly administered and implemented, and obtaining final dismissal of the Action.

    B.  <u>Costs and Administrative Fees</u>.

    Class Counsel shall receive reimbursement of their out-of-pocket costs and Administrative Fees in the amount of $47,649.35. This payment will reimburse Class counsel for all out-of-pocket costs and Administrative Fees.  Class Counsel is responsible for retaining and paying the Settlement Administrator from these funds.

    C.  <u>Net Settlement Fund</u>.

    The Net Settlement Fund is the amount equal to the Gross Settlement Amount, less Class Counsel's fees and Costs and Administrative Fees. The Net Settlement Fund shall be allocated between each Class Member by assigning a settlement factor to each Class Member based upon the number of school years the Class Member officiated as a PIAA registered official between the 2015/2016 school year and the 2017/2018 school year, and the number of sports that the Class Member officiated each school year, as follows:

      i.    The first sport that each Class Member officiated in a given school year is assigned a factor of 1.

      ii.   The second sport each Class Member officiated in a given school year is assigned a factor of .8.

      iii.  The third and each additional sport a Class Member officiated in a given school year is assigned a factor of .6.

      iv.   Each individual Class Member's share of the Net Settlement Fund will be the amount equal to the Net Settlement Fund divided by the collective total settlement

factors for all Class Members, multiplied by the individual Class Member's settlement factors.

Class Counsel shall be responsible for calculating each Class Members' share of the Net Settlement Fund in a matter consistent with this Agreement and based upon the confidential information shared between the parties during the mediation process in the Lawsuit.

Any disagreement between the parties regarding the allocation of the Net Settlement Fund that cannot be resolved by the parties shall be submitted to the Court for final determination.

6.    <u>Funding</u>.  Within 15 days of the Court's granting of the Approval Motion, PIAA shall deposit the applicable Gross Settlement Amount into a Qualified Settlement Fund ("QSF") with the Settlement Administrator.

7.    <u>Disbursement by Settlement Administrator</u>.  All disbursements shall be made from the QSF. The Settlement Administrator shall be the only entity authorized to make withdrawals or payments from the QSF.

8.    <u>Payments to Class Members</u>.  Within 30 days of PIAA's deposit of the Gross Settlement Amount into the QSF, the Settlement Administrator will send the Settlement Award checks to the Class Members along with the Settlement Notice.

9.    <u>Taxes</u>.  The Settlement Administrator shall issue any necessary Form 1099 to each Class Member for his or her respective Settlement Payment and Class Members shall be responsible for any income tax obligations associated with the Settlement Payment.

10.    <u>Unclaimed Funds</u>.  Unclaimed Settlement Awards (checks not deposited within the 180-day expiration period) shall be deposited with the lost property department of the state in which the Class Member last resided.

11.    <u>Dismissal</u>. All payments due from PIAA under this Settlement are conditioned entirely upon approval of this Settlement in its entirety by the Court and the dismissal with prejudice of the Lawsuit.

A.    PIAA shall not be required to make any payments to anyone under this Agreement in the event that any of the following occurs: (1) the Agreement is not approved in its entirety by the Court; or (2) this Agreement is terminated, cancelled, declared void, or fails to become effective in accordance with its terms.

B.    In the event of any of the above occurrences, the Parties will each bear their own costs and fees with regard to the efforts to carry out the terms of this Agreement.  Further, in such event, this Agreement, except for

4

those provisions relating to non-admissibility and non-admission of liability, shall be deemed null and void.

C. Upon entry of the Dismissal Order, each of the Class Members shall be deemed to have fully, finally, and forever released, dismissed with prejudice, relinquished, and discharged the Releasees from all Released Claims, as those terms are defined in the Release set forth below. Class Members will all be subject to the *res judicata* effect of the dismissal of this Lawsuit and be deemed to have signed the Release.

## RELEASES

12.    Release.  In consideration of PIAA's payment of the Gross Settlement Amount and the other benefits to be received by Class Members under this Agreement, Named Plaintiffs, on behalf of themselves and all Opt-In Plaintiffs, hereby release and discharge all Releasees from and against all Released Claims.

A. "Releasee(s)" means PIAA, and its past and present officers, directors, employees, counsel, insurers and successors.

B. "Released Claims" means any and all claims, obligations, demands, actions, rights, causes of action and liabilities, whether known or unknown, against Releasees that were or could have been asserted in the Action based on allegations of unpaid wages, minimum wage, overtime compensation, liquidated or other damages, unpaid costs, restitution, business expenses, penalties, interest, attorneys' fees, litigation costs or other compensation or relief arising during the Class Period and arising under the FLSA, PMWA, the Pennsylvania Wage Payment and Collection Law, or any other wage-related law, or the common law.

C. Release Language in Settlement Notice.  The Settlement Notice to be provided to each Opt-In Plaintiff will contain information concerning this Release as set forth in Exhibit 3.

## MISCELLANEOUS PROVISIONS

13.    No Admission of Liability.  This Agreement represents a compromise and settlement of claims that are contested in good faith, and it shall not be deemed an admission by any of the Parties as to the merits of any claim or any potential defense. The Releasees specifically and generally deny any and all liability or wrongdoing of any sort with regard to any of the claims asserted in the Lawsuit and make no concessions or admissions of liability of any sort.

14.    Inadmissibility.  Except for purposes relating to Court approval of this settlement and dismissal of this Lawsuit, or enforcing the terms of this Agreement, neither this Agreement nor any of its terms as reflected in any prior drafts, communications between counsel, or the prior Memorandum of Understanding may be

construed as, offered or admitted in evidence for any purpose adverse to any of the Releasees, including, without limitation, evidence of an admission or indication by any Released Party of any liability, fault or wrongdoing in relation to any of the allegations set forth in the Lawsuit.

15.    Authorization to Enter Into Settlement Agreement.  Class Counsel, on behalf of the Class Members, represent that, after consultation with and approval of the Named Plaintiffs, they are expressly authorized by the Named Plaintiffs to take all appropriate action required or permitted to be taken by the Named Plaintiffs pursuant to this Agreement to effect its terms, and are also expressly authorized to enter into any modifications or amendments to this Agreement on behalf of the Class Members that they deem appropriate.  As provided in the Consents, Named Plaintiffs are authorized by Opt-In Plaintiffs to enter into this Agreement.  PIAA's counsel also represents that they are expressly authorized to take all appropriate action required or permitted to be taken by PIAA pursuant to this Agreement to meet its terms.

16.    Entire Agreement.  This Agreement and Exhibit 3 attached hereto constitutes the entire agreement between the Parties regarding the subject matter discussed herein, and no representations, warranties, or inducements have been made to any of the Parties concerning this Agreement other than the representations, warranties, and covenants contained and memorialized herein.  This Agreement supersedes all prior negotiations between the parties, including, but not limited to, the Memorandum of Understanding attached hereto as Exhibit 1.  The parties acknowledge that the law prohibits any person from retaliating against an employee for participating in, or electing not to participate in, a lawsuit under the FLSA or PMWA.  Nothing in this Agreement is intended to limit or expand these statutory provisions.

17.    Counterparts.  This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument.

18.    Class Counsel Commitment.  If, at any time prior to December 31, 2022, Class Counsel is engaged to represent any PIAA official with respect to potential claims against PIAA, Class Counsel will advise counsel for PIAA prior to filing a lawsuit so that the parties will have a reasonable opportunity to discuss and consider whether any such potential claims can be resolved before a lawsuit is filed.

19.    Jurisdiction of the Court.  All Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing this Agreement.  Any action to enforce this Agreement shall be commenced and maintained only in the United States District Court for the Western District of Pennsylvania.

20.    Modification.  This Agreement may not be changed, altered, or modified, except in writing signed by Class Counsel, the Named Plaintiffs, and PIAA and approved by the Court.

21.    Cooperation in Drafting.  The Parties have cooperated in the drafting and preparation of this Agreement; hence the drafting of this Agreement shall not be

construed against any of the Parties. The Parties agree that the terms and conditions of this Agreement were negotiated at arm's length and in good faith by the Parties, and reflect a settlement that was reached voluntarily based upon adequate information and sufficient discovery and after consultation with experienced legal counsel.

    22. Governing Law. All terms of this Settlement Agreement and the exhibits hereto shall be governed by and interpreted according to the laws of the Commonwealth of Pennsylvania and the United States of America, where applicable.

    IN WITNESS WHEREOF, the Named Plaintiffs, Class Counsel, and PIAA have executed this Agreement as follows:

**NAMED PLAINTIFF:** _Charlee R Rudusky (Jun 22, 2019)_  Date: Jun 22, 2019

**NAMED PLAINTIFF:** _Mario Seneca (Jun 25, 2019)_  Date: Jun 25, 2019

**CLASS COUNSEL:** _____  Date: _____,____

**CLASS COUNSEL:** _____  Date: _____,____

**CLASS COUNSEL:** _____  Date: _____,____

**PIAA:** _Robert A. Lombardi_  Date: July 2, 2019

construed against any of the Parties. The Parties agree that the terms and conditions of this Agreement were negotiated at arm's length and in good faith by the Parties, and reflect a settlement that was reached voluntarily based upon adequate information and sufficient discovery and after consultation with experienced legal counsel.

22. <u>Governing Law</u>. All terms of this Settlement Agreement and the exhibits hereto shall be governed by and interpreted according to the laws of the Commonwealth of Pennsylvania and the United States of America, where applicable.

IN WITNESS WHEREOF, the Named Plaintiffs, Class Counsel, and PIAA have executed this Agreement as follows:

**NAMED PLAINTIFF:** Charles R Ruslavage (Jun 22, 2019)     Date: Jun 22, 2019 _____, ____

**NAMED PLAINTIFF:** Mario Seneca (Jun 25, 2019)     Date: Jun 25, 2019 _____, ____

**CLASS COUNSEL:** _____     Date: Jul 3 , 19

**CLASS COUNSEL:** Richard Blech (Jul 2, 2019)     Date: Jul 2, 2019 _____, ____

**CLASS COUNSEL:** Joshua P. Geist (Jul 2, 2019)     Date: Jul 2, 2019 _____, ____

**PIAA:** _____     Date: _____, ____

# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBUGH DIVISION

| | |
|---|---|
| CHARLES RUSLAVAGE, AND<br>MARIO SENECA individually and for<br>others similarly situated, | DOCKET NO. 2:17-cv-01598-MJH |
| Plaintiff, | |
| | JURY TRIAL DEMANDED |
| v. | |
| | CLASS/COLLECTIVE ACTION |
| PENNSYLVANIA INTERSCHOLASTIC<br>ATHLETIC ASSOCIATION, INC., | |
| Defendant. | PURSUANT TO 29 U.S.C. §216(b)/<br>FED. R. CIV. P. 23 |

## MEMORANDUM OF UNDERSTANDING

Charles Ruslavage and Mario Seneca, individually and on behalf of the FLSA Opt-in

Class, and Pennsylvania Interscholastic Athletic Association, Inc. (together "Parties") agree

to the following general terms to resolve the above captioned litigation.

1. The amount of the settlement fund will be contingent upon the outcome of the pending appeal before the United States Court of Appeals for the District of Columbia Circuit in *PIAA v. NLRB*, case Nos. 18-1037 & 18-1043:

   a. If the DC Circuit affirms the decision of the NLRB, the total gross settlement fund will be **$375,000.**
   b. If the DC Circuit remands the decision of the NLRB back to the Board, the total gross settlement fund will be **$275,000.**
   c. If the DC Circuit reverses the decision of the NLRB, the total gross settlement fund will be **$262,500.**

2. Regardless of the settlement amount, PIAA agrees that each of the Plaintiffs and Opt-ins who remain active PIAA-registered officials will be permitted to attend one PIAA Annual Officials' Convention between 2020 and 2024 without paying a registration fee. For clarity, the registration fee for the 2018 officials' convention was $100 for early registration up to $200 for the latest registration. Other generally applicable registration limitations may apply. Generally, this adds a value of approximately $45,000.00 to the settlement.

2. Named Plaintiffs and all officials who have filed a Consent to Join in this case will be bound by the settlement. This includes the named plaintiffs, the 439 other

1

officials who have opted-in to date, and 5 additional officials who have signed and returned a Consent to Join which has not yet been filed with the Court, for a total of 446 plaintiffs. Plaintiffs' counsel will promptly file the 5 remaining Consents.

4. The Settlement Agreement will provide that, upon Court approval, the lawsuit will be dismissed with prejudice and all 446 participating officials will release **all** claims, obligations, demands, causes of action and liabilities arising up to the date of the agreement, whether known or unknown, for alleged unpaid wages, minimum wage, overtime, restitution, business expenses, liquidated or other damages, penalties, interest, attorneys' fees, litigation costs, or any other wage-related compensation and relief under the FLSA, PMWA, PWCPL, any local wage and hour ordinance, or the common law, against PIAA and all related entities, directors, officers and employees.

5. This MOU summarizes the most pertinent points of the settlement and the Parties anticipate a full and complete settlement agreement will be put together with input from all Parties.

6. The terms of settlement will remain confidential until such time that the DC Circuit issues a decision. The Parties do not intend to file this MOU with the Court.

AGREED TO AND STIPULATED BY:

_____
Andrew W. Dunlap
Attorneys for Ruslavage, Seneca and the Opt-ins

Date: __3/6/19__

_____
Andrew Levy
Attorney for Pennsylvania Interscholastic Athletic Association

Date: __7/5/19__

2

# EXHIBIT 2

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 16, 2018          Decided June 14, 2019

No. 18-1037

PENNSYLVANIA INTERSCHOLASTIC ATHLETIC ASSOCIATION,
INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL
UNION,
INTERVENOR

———

Consolidated with 18-1043

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Maurice Baskin* argued the cause for petitioner. With him
on the briefs was *Tony W. Torain*.

*William E. Quirk* was on the brief for *amicus curiae*
National Federation of State High School Associations in
support of petitioner.

2

*Eric Weitz*, Attorney, National Labor Relations Board, was on the brief for respondent. With him on the brief were *Peter B. Robb*, General Counsel, *John W. Kyle*, Deputy General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

*Melvin S. Schwarzwald* argued the cause for intervenor in support of respondent. With him on the brief was *Timothy Gallagher*.

*George N. Davies* was on the brief for *amicus curiae* Association of Minor League Umpires, OPEIU Guild 332, in support of respondent.

Before: GARLAND, *Chief Judge*, and GRIFFITH and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: This case asks whether lacrosse officials working for the Pennsylvania Interscholastic Athletic Association (PIAA) are employees subject to the National Labor Relations Act (NLRA) or independent contractors exempt from its protections. "[T]here is no shorthand formula or magic phrase that can be applied to find the answer . . . ." *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968). Rather, we must evaluate all aspects of the relationship using several factors from the common law of agency as a guide. Because the weight of the evidence demonstrates that the officials are independent contractors, we grant PIAA's petition.

I

3

PIAA develops and administers rules and procedures for 20 sports for more than 1,600 junior high and high schools in 12 geographic districts throughout Pennsylvania. It also selects officials to referee these sports. Officials must meet certain criteria to join and, once hired, must comply with certain rules to remain PIAA officiators.

In 2015, the Office and Professional Employees International Union (the "Union") filed a petition with the National Labor Relations Board (NLRB) seeking to represent approximately 140 individuals who officiate lacrosse games in Districts VII and VIII. PIAA contested the Union's right to hold an election on three grounds. First, PIAA claimed that it is a political subdivision of Pennsylvania, not an "employer," and is exempt from the NLRA. *See* 29 U.S.C. §§ 152(2), 158. Second, PIAA argued that the lacrosse officials are independent contractors, rather than "employees," and thus not protected by the Act. *See id.* §§ 152(3), 157. Finally, PIAA contended that even if it is an employer and the officials are employees, the officials were not eligible for certification as a bargaining unit because of the sporadic nature of their work.

The Regional NLRB Director rejected PIAA's arguments and directed that a Union election take place. PIAA petitioned the Board for review of the Regional Director's conclusions that it is an employer and the officials are employees. While that petition was pending, the Union conducted its election.

The Board took up only the issue of whether the officials are employees or independent contractors. *PIAA and Office & Prof'l Emps. Int'l Union*, 365 N.L.R.B. No. 107, at 1 n.2 (July 11, 2017); *see* J.A. 745 (explaining that the Regional Director's conclusion that PIAA was not a political subdivision did not raise "a substantial issue warranting review"). Two members voted to affirm the Regional Director's decision that the

4

officials are employees. The third dissented. *PIAA*, 365 N.L.R.B. No. 107, at 1.

PIAA subsequently refused to bargain with the Union, which the Board held was a violation of the NLRA. PIAA petitioned this court for review of the Board's conclusions, and the Board cross-applied for enforcement. We have jurisdiction over PIAA's petition pursuant to 29 U.S.C. § 160(f), and over the Board's cross-application pursuant to § 160(e).

II

Because the lacrosse officials who sought to join the Union are independent contractors, the NLRA does not apply to them, and we need not consider whether PIAA is a political subdivision or an employer.

A

Determining whether a worker is an employee or independent contractor for purposes of the NLRA is more art than science. *See United Ins.*, 390 U.S. at 258. As a guide, we and the Board look to ten factors from § 220(2) of the Restatement (Second) of Agency, as well as "whether the workers have a 'significant entrepreneurial opportunity for gain or loss.'" *Lancaster Symphony Orchestra v. NLRB*, 822 F.3d 563, 565-66 (D.C. Cir. 2016) (quoting *Corp. Exp. Delivery Sys. v. NLRB*, 292 F.3d 777, 780 (D.C. Cir. 2002)).[1]

---

[1] The ten Restatement factors are: (1) the extent of the employer's control over the work; (2) whether the worker "is engaged in a distinct occupation or business"; (3) "the kind of occupation," and whether it "is usually done under the direction of the employer or a specialist without supervision"; (4) the skill required for the occupation; (5) who "supplies the instrumentalities, tools, and the place of work"; (6) "the length of time for which the

5

"[N]o one factor" is *per se* determinative, however, and we cannot simply count up the factors on each side to declare a winner. *United Ins.*, 390 U.S. at 258; *FedEx Home Delivery v. NLRB* (*FedEx I*), 563 F.3d 492, 497 n.3 (D.C. Cir. 2009). Rather, we must "assess[] and weigh[]" "all of the incidents of the relationship . . . in light of the pertinent common-law agency principles" to identify the "decisive factors" in each particular case. *United Ins.*, 390 U.S. at 258.

As this analysis does not involve any "special administrative expertise that a court does not possess," *id.* at 260, we "need not accord the Board's decision that special credence which we normally show merely because it represents the agency's considered judgment," *Lancaster Symphony Orchestra*, 822 F.3d at 566 (quoting *C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855, 858 (D.C. Cir. 1995)). "That said, because drawing [this] distinction requires an exercise of judgment about facts, to which we would ordinarily defer, we do not review the Board's determination de novo. Instead, we take a middle course, and will uphold the Board if at least it can be said to have made a choice between two fairly conflicting views." *Id.* (internal quotation marks, citations, and alterations omitted). However, we will reverse the Board if "the evidence, fairly considered, fails to support the conclusion that the [workers] are employees under traditional agency law principles." *N. Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 604 (D.C. Cir. 1989).

---

person is employed"; (7) "the method of payment, whether by the time or by the job"; (8) whether the work is part of the employer's "regular business"; (9) whether "the parties believe they are creating the relation of master and servant"; and (10) whether the employer "is or is not in business." Restatement (Second) of Agency § 220(2) (Am. Law Inst. 1958).

6

B

We reverse the Board because it failed to adequately account for the strength of the two aspects of this relationship that most strongly favor independent-contractor status: the few times on which PIAA actually pays the officials and the short duration of their employment.

The strongest factor supporting independent-contractor status is the fact that PIAA itself pays officials for *very* few games per year (factor 7); for the other games, officials are paid by the schools. During the 7-week regular season, officials typically work 2-3 games per week, though some work as few as 2 games total. Officials negotiate with and receive their per-game compensation directly from the schools. PIAA is not involved in the payment; it merely requires officials to sign contracts with the schools and stipulates that officials be paid with checks. In the 4-week postseason, by contrast, PIAA sets the per-game fee, selects officials, and pays them. *See* RESTATEMENT (SECOND) OF AGENCY § 220(2) cmt. j (payment by the job, rather than by the hour, favors contractor finding). The postseason includes both intra- and inter-district championships. The record does not indicate how many games or days officials work during the intra-district championships, but officials work at most 4 days during the inter-district championships. But even assuming that each game occurs on a separate day and that officials work a similar amount during the regular season and the intra-district championships, this amounts to, at most, 8-10 days of postseason work. In fact, the Association represented without contradiction that *it pays the average official for only 3 games per year*, *see* Tr. of Oral Arg. at 10:4-8, and officials who do not referee any postseason

7

games never receive payment from PIAA.[2] It simply cannot be—as the Board thought—that the extent to which PIAA controls how the officials are compensated by the schools "outweighs" this other compelling evidence. *See PIAA*, 365 N.L.R.B. No. 107, at 8-9.

The fact that PIAA lacrosse officials are eligible to earn money from this position for only 11 weeks per year (factor 6) also strongly supports independent-contractor status. As we have explained, the average official works, at most, 22-31 days per year (14-21 in the regular season and 8-10 in the postseason). Further, even under a generous estimate, officials work only 2 hours per game (based on record evidence that each game lasts about 1 hour, *see* Tr. of Oral Arg. at 20:19-21:5, and that officials must "[r]eport for duty at least 30 minutes before the scheduled start of" each game, J.A. 67). At oral argument, PIAA's counsel represented without contradiction that officials work "on average" only 20 hours per year. Tr. of Oral Arg. at 10:3-4. Whether 20 hours or 60, this heavily favors independent-contractor status. *See Lancaster Symphony Orchestra*, 822 F.3d at 568 (that musicians worked at most 140-150 hours per year favored independent-contractor status); *Pa. Acad. of the Fine Arts*, 343 N.L.R.B. 846, 846-47 (2004) (same, where models worked 1.5-226 hours per semester).

The Board erroneously discounted this short duration of the officials' employment because "PIAA registers officials

---

[2] During the 2014-2015 lacrosse season, 12 of the 42 officiating spots in the inter-district playoffs went to officials from Districts VII and VIII. The record does not specify the number of spots available in the intra-district playoffs and inter-district championship game, or the breakdown by district. Still, it seems highly unlikely that every one of the approximately 140 lacrosse officials registered in Districts VII and VIII refereed a postseason game.

8

annually," encourages re-registration, and "many officials work for PIAA for many years." *PIAA*, 365 N.L.R.B. No. 107, at 8. But unlike a worker who is automatically invited back year after year and, if available, assigned hours, PIAA officials must satisfy various criteria to re-register and there is no guarantee that registered officials will be selected to referee any games in a given year. *See In re Lancaster Symphony Orchestra*, 357 N.L.R.B. 1761, 1761 (2011).

Three other Restatement factors also suggest that PIAA's lacrosse officials are independent contractors, albeit not as strongly. Officiating lacrosse requires skill and expertise (factor 4), but not on the same level as a professional musician. *See* RESTATEMENT (SECOND) OF AGENCY § 220(2) cmt. h (work requiring education or skill suggests contractor relationship); *Lancaster Symphony Orchestra*, 822 F.3d at 568. The officials must provide their own equipment (factor 5), including whistles, pencils, and penalty markers. That suggests they are independent contractors but only weakly, for the cost of these supplies pales in comparison to that of a musical instrument or delivery truck. *See Lancaster Symphony Orchestra*, 822 F.3d at 569; *C.C. Eastern*, 60 F.3d at 858; *see also* RESTATEMENT (SECOND) OF AGENCY § 220(2) cmt. k (use of employer's tools suggests employee status, "especially if they are of substantial value"). And although PIAA designates the location of each postseason game, its member schools own and operate the fields. *See Lancaster Symphony Orchestra*, 822 F.3d at 569 (that orchestra supplied the concert hall favored employee status). As for the parties' understanding of their relationship (factor 9), numerous documents state that the officials are independent contractors, including the PIAA Constitution and Bylaws, the Officials' Manual, and the application to register as an official. Although PIAA unilaterally created these documents, which somewhat undercuts their value because the officials could not negotiate

9

the terms, *see Local 777, Democratic Union Org. Comm. v. NLRB*, 603 F.2d 862, 878-79 & n.45 (D.C. Cir. 1978), the officials still agreed to adhere to them. Moreover, the Association does not deduct withholdings on the very few days it issues the officials' paychecks. *See Lancaster Symphony Orchestra*, 822 F.3d at 568 (absence of withholding suggests the parties believe the workers are independent contractors). This outweighs the fact that PIAA provides the officials with certain types of insurance, which favors employee status. *See FedEx I*, 563 F.3d at 498 n.4.

A few factors suggest the officials are employees, but not as strongly as those that point towards classifying them as independent contractors. PIAA, a registered 501(c)(3), is in business (factor 10), and so is more likely to hire an employee than a non-market participant. Its aim is to create "a system of fair play for interscholastic sports," PIAA Br. 40, which requires both uniform rules and officials to enforce them, meaning the nature of its business and the officials' business is the same (factor 2). PIAA's attempt to separate this into two distinct categories—its "business of setting standards of fairness for amateur athletic competitions" and the officials' business of "officiating individual competitions," PIAA Br. 30—is unavailing. And because PIAA relies on these officials to carry out its purpose and their work frequently overlaps, the officials are part of PIAA's regular business (factor 8). *See Lancaster Symphony Orchestra*, 822 F.3d at 568.

That brings us to entrepreneurial opportunity. Because the officials have some opportunities to work "harder" but none to work "smarter," this favors an employee finding. *Id.* at 569 (quoting *Corp. Exp. Delivery Sys.*, 292 F.3d at 780). The officials can take on more games in the district in which they are registered. They can accept other referee positions, although PIAA has a near-monopoly on junior and high school

10

level lacrosse in Pennsylvania, and there is no evidence in the record that any official has accepted another lacrosse refereeing position in Pennsylvania or elsewhere. These chances to work "harder" signify some opportunity for entrepreneurialism, but they "provide[] only miniscule support for [independent-contractor] status." *Id.* Far more important is whether officials have the chance to work "smarter." They do not. Officials have no control over the length of the games they referee, *see Corp. Exp. Delivery Sys.*, 292 F.3d at 780, and they may not hire assistants, assign games to others, or find cheaper replacements and pocket the difference, *see FedEx I*, 563 F.3d at 499-500. Combined, the evidence demonstrates only "limited opportunit[y] for entrepreneurial gain," which favors an employee finding. *Lancaster Symphony Orchestra*, 822 F.3d at 570.[3]

That leaves us with the question of PIAA's control and supervision over the "means and manner" of the officials' work, and whether such work is usually done in the locality under an employer's supervision or by a specialist without supervision (factors 1 and 3). *Id.* at 566 (quoting *C.C. Eastern*, 60 F.3d at 858). In some respects, that control is significant and points towards employee status: PIAA dictates how to become

---

[3] The Board relied on the test for entrepreneurial opportunity that it articulated in *FedEx Home Delivery*, 361 N.L.R.B. 610 (2014). *See PIAA*, 365 N.L.R.B. No. 107, at 4, 10-14. After argument, PIAA submitted a letter pursuant to Rule 28(j) notifying us that in *SuperShuttle DFW, Inc.*, 367 N.L.R.B. No. 75 (Jan. 25, 2019), the Board overruled that portion of *FedEx* and articulated a new approach for how to treat entrepreneurial opportunity. Despite this change, we see no need to remand. Whether the Board's approach has indeed changed is immaterial because, as *SuperShuttle* recognizes, we owe the Board no deference on matters of law, including the proper formulation of this inquiry. *Id.* at 13; *see FedEx Home Delivery v. NLRB*, 849 F.3d 1123, 1128 (D.C. Cir. 2017).

11

and remain an official, and controls their conduct and the uniforms they must wear. *See id.* at 567. PIAA also sets the rules officials are charged with enforcing using a template from the National Federation of State High School Associations that PIAA updates as it sees fit. *See Collegiate Basketball Officials Ass'n v. NLRB* (*Big East*), 836 F.2d 143, 148 (3d Cir. 1987) (choosing to adopt another body's rules indicates control). But telling an official to call a game fairly is hardly akin to instructing a worker how to work, as the symphony conductor does when he tells the bassoonist to play a particular note soft or loud. *See Lancaster Symphony Orchestra*, 822 F.3d at 566; *Pa. Acad. of the Fine Arts*, 343 N.L.R.B. at 847 (that individual "retain[s] significant discretion" over how to execute employer's general guidance favors independent-contractor status). We recognize that this is somewhat inherent in the nature of officiating. But PIAA could exercise more control in the moment by, for example, assigning Association representatives to review calls made on the field or providing feedback to officials at the earliest possible moment. It does neither. *See Big East*, 836 F.2d at 148 (finding "significant supervisory control" where officials received feedback "at the earliest convenient moment, half-time or postgame"). Moreover, although PIAA reserves the right to suspend or disqualify officials who violate these various rules, there is no evidence that it has ever done so. That lessens some of the other indicia of control. *See Lancaster Symphony Orchestra*, 822 F.3d at 566 (that organization has and enforces detailed rules of conduct indicates significant control); *United Ins.*, 390 U.S. at 258 (same). Apart from evidence about PIAA itself, the record does not reveal whether similar refereeing in the area PIAA serves is usually done by supervised employees or independently. Factors 1 and 3 are thus a mixed bag, but on balance, they slightly favor employee status.

12

C

This case turns on the strength of the few times on which PIAA actually pays the officials and the short duration of the officials' employment. When these factors are given proper consideration, the weight of the evidence demonstrates that these amateur lacrosse officials are independent contractors. Indeed, "almost every state court decision involving an amateur sports official's employment status" has come to the same conclusion. Marc Sushner, *Are Amateur Sports Officials Employees?*, 12 Sports Law. J. 123, 125 (2005); *accord* Walter T. Champion, Jr., Fundamentals of Sports Law § 10:4 (2018) (collecting worker's compensation cases); *see also Big East*, 836 F.2d 143 (holding that certain college basketball officials are independent contractors). Accordingly, we reverse the Board and hold that the officials are not subject to the protections of the NLRA. *See* 29 U.S.C. §§ 152(3), 157. We therefore need not decide whether PIAA is an employer or a political subdivision of Pennsylvania.

III

We grant the petition for review, vacate the Board's order, and deny the cross-application for enforcement.

*So ordered.*

# EXHIBIT 3

**[Case Caption]**

**Notice of Settlement and One-Time Waiver of PIAA Officials' Convention Registration Fee**

**Settlement Overview:**

You joined a lawsuit filed by Charles Ruslavage and Mario Seneca against Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA") by signing a Consent to Join form, which has been filed with the United States District Court for the Western District of Pennsylvania. As you are aware, the lawsuit sought certain minimum wage payments on behalf of PIAA officials under the federal Fair Labor Standards Act and the Pennsylvania Minimum Wage Act. PIAA defended the claims and believes that the officials are properly classified as independent contractors and that officials are not due any additional compensation beyond the per contest game fees that they receive. Following significant discovery in the case, the parties have reached a final settlement. Based upon an evaluation of all of the circumstances, Mr. Ruslavage, Mr. Seneca, and your counsel, Josephson Dunlap Law Firm, Bruckner Burch, P.L.L.C., and Goodrich & Geist, P.C., have determined that this settlement is fair, reasonable and adequate. The court has also approved this settlement as fair, reasonable, and adequate.

**Settlement Compensation:**

Enclosed is a check which represents your portion of the settlement.

**One-Time Waiver of PIAA Officials' Convention Registration Fee:**

In addition to the enclosed check, as a term of the settlement, PIAA has agreed that, so long as you remain an active PIAA-registered official, you will be permitted to attend one PIAA Annual Officials' Convention between 2020 and 2024 without paying the registration fee. At the time that you register for the Convention, please make a notation on the registration form "Lawsuit Settlement." Please note that other generally applicable registration limitations may apply, and that you may only use this waiver of the registration fee once between 2020-2024.

**Release of Claims:**

By operation of settlement and the Court's approval, you have fully, finally, and forever released, dismissed with prejudice, relinquished and discharged PIAA and its officers, directors, employees, counsel, insurers and successors from and against any and all claims, obligations, demands, actions, rights, causes of action and liabilities, whether known or unknown, that were or could have been asserted in the lawsuit based on allegations of unpaid wages, minimum wage, overtime compensation, liquidated or other damages, unpaid costs, restitution, business expenses, penalties, interest, attorneys' fees, litigation costs or other compensation or relief arising during the period from December 8, 2014 to July 3, 2019, and arising under the Fair Labor Standards Act, the Pennsylvania Minimum Wage Act, the Pennsylvania Wage Payment and Collection Law, any other wage-related law, or the common law.